IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEGAN ELIZABETH ALTORFER,                    No. 3:14-cv-01933-HZ

        Plaintiff,

   v.

CAROLYN W. COLVIN, Acting                    OPINION & ORDER
Commissioner of Social Security,

        Defendant

Max Rae
P.O. Box 7790
Salem, Oregon 97303

    Attorney for Plaintiff

Billy J. Williams
ACTING UNITED STATES ATTORNEY
District of Oregon
Janice E. Hebert
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suit 600
Portland, Oregon 97204-2902

/ / /

1 - OPINION & ORDER

Lisa Goldoftas
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

      Attorneys for Defendant

HERNANDEZ, District Judge:

      Plaintiff Megan Elizabeth Altorfer brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). I reverse the Commissioner's decision and remand for benefits.

## PROCEDURAL BACKGROUND

      Plaintiff applied for DIB and SSI on December 17, 2010, alleging an onset date of June 3, 2009. Tr. 190-97. Her applications were denied initially and on reconsideration. Tr. 59-67, 77, 79-87, 98-102, 107, 110-12, 115 (DIB); Tr 68-76, 78, 88-97, 103-07, 113-14, 166 (SSI). On April 15, 2013, Plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 31-58. On April 26, 2013, the ALJ found Plaintiff not disabled. Tr. 13-30. The Appeals Council denied review. Tr. 1-5.

## FACTUAL BACKGROUND

      Plaintiff alleges disability based on having bipolar disorder, post-traumatic stress disorder, anxiety, and depression. Tr. 227. At the time of the hearing, she was twenty-eight years old. Tr. 192 (showing date of birth). She has a GED, Tr. 228, has attended community college, and has past relevant work experience as a customer representative for a telephone

2 - OPINION & ORDER

company.  Tr. 23-24.

SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(a).

Disability claims are evaluated according to a five-step procedure.  See Valentine v. Comm'r, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability).   The claimant bears the ultimate burden of proving disability. Id.

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  Yuckert, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.  Yuckert, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any

3 - OPINION & ORDER

impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20

C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, the claimant is not disabled.  If the

claimant cannot perform past relevant work, the burden shifts to the Commissioner.  In step five,

the Commissioner must establish that the claimant can perform other work.  Yuckert, 482 U.S. at

141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets his burden

and proves that the claimant is able to perform other work which exists in the national economy,

the claimant is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

THE ALJ'S DECISION

At step one, the ALJ determined that other than one unsuccessful work attempt, Plaintiff

had not engaged in substantial gainful activity since her alleged onset date.  Tr. 18.  Next, at step

two, the ALJ determined that Plaintiff has severe impairments of morbid obesity, binge eating

disorder, bipoloar disorder, major depressive disorder, attention hyperactivity disorder, post-

traumatic stress disorder, and anxiety disorder.  Id.  However, at step three, the ALJ determined

that Plaintiff's impairments did not meet or equal, either singly or in combination, a listed

impairment.  Tr.  19-20.

At step four, the ALJ concluded that Plaintiff has the residual functional capacity (RFC)

to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), except

> (1) the claimant is able to lift up to 50 pounds occasionally, lift and carry up to 25
> pounds frequently in medium work as defined by the regulations; (2) the claimant
> is limited to frequent climbing of ramps and stairs, and frequent balancing,
> stooping, kneeling, crouching, and crawling; (3) the claimant is limited to
> occasional climbing of ladders, ropes, and scaffolds; (4) the claimant is limited to
> no more than occasional exposure to pulmonary irritants such as fumes, odors,
> dust, gases, chemicals, and poorly ventilated spaces; (5) the claimant is fully
> capable of learning, remembering and performing simple, routine and repetitive
> work tasks, involving simple work instructions, which are performed in a low

stress work environment, defined as one in which there is no strict production
pace, few work place changes, and no "over the shoulder" supervision; (6) the
claimant is limited to occasional contact with supervisors and coworkers, but
should have minimal to no contact with the public; and (7) the claimant will
perform optimally in work tasks that allow her to work independently of others.

Tr. 20.

With this RFC, the ALJ determined that Plaintiff is unable to perform any of her past

relevant work.  Tr. 23.  However, at step five, the ALJ determined that Plaintiff is able to perform

jobs that exist in significant numbers in the economy such as hand packer, stock checker, and

linen supply department helper.  Tr. 24.  Thus, the ALJ determined that Plaintiff is not disabled.

Id.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the

Commissioner's findings are based on legal error or are not supported by substantial evidence in

the record as a whole.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).  "Substantial

evidence means more than a mere scintilla but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (internal

quotation marks omitted).  The court considers the record as a whole, including both the

evidence that supports and detracts from the Commissioner's decision.  Id.; Lingenfelter v.

Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  "Where the evidence is susceptible to more than

one rational interpretation, the ALJ's decision must be affirmed."  Vasquez, 572 F.3d at 591

(internal quotation marks and brackets omitted); see also Massachi v. Astrue, 486 F.3d 1149,

1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the

court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

DISCUSSION

Plaintiff argues that the ALL erred in (1) finding her subjective limitations testimony not credible; (2) improperly rejecting the functional limitation assessment of her treating nurse practitioner; (3) improperly rejecting the testimony of lay witness Christopher Roller; and in (4) failing to address disability accommodations granted to her by Chemeketa Community College: Without these errors, she contends that the ALJ should have found her disabled at either Step 3 or Step 5 of the sequential analysis.

I.  Credibility Determination

The ALJ is responsible for determining credibility.  Vasquez, 572 F.3d at 591.  Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.  Carmickle v. Comm'r, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on 'clear and convincing reasons'"); see also Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility:  First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the claimant has presented such evidence, and there is no evidence of malingering, the ALJ must then give "specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.") (internal quotation marks omitted).

The ALJ gave six reasons in support of his finding that Plaintiff was only a partially credible witness and rejecting her testimony that her mental impairments of anxiety, depression, and mania were debilitating to the point of precluding all work activity.  Tr. 23.[1]  First, he noted that she was able to work at substantial gainful levels for many years in customer service without a problem.  Second, he found that there was a "conflict in the record" regarding when she stopped working.  Id.  Third, she was actively applying for customer service jobs despite her alleged disability.  Fourth, she performed seasonal employment at Converse in 2012.  Fifth, her activities of daily living supported the conclusion that she could return to work under the ALJ's RFC.  Id.  And, sixth, she filed her claim at a time when she was separating from her husband and then divorcing, and during which she was contemplating bankruptcy, which suggested a motive other than impairment for her DIB.  Id.

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed

---

[1]  Plaintiff argues that the ALJ's opinion is legally flawed because he did not identify what testimony was credible and did not explain what evidence undermined her complaints.  In support, Plaintiff cites Brown-Hunter v. Colvin, 798 F.3d 749 (9th Cir. 2015), amended and superseded, 2015 WL 6684997 (9th Cir. Nov. 3, 2015).  In the November 3, 2015 amended opinion, the Ninth Circuit held that the ALJ erred by stating only a general, nonspecific finding regarding credibility after simply reciting the medical evidence.  2015 WL 6684997, at **3, 5-6.  Brown-Hunter is distinguishable because here, the ALJ specified that he was rejecting Plaintiff's testimony as to her mental health impairments and he gave six independent reasons in support.  This explanation sufficiently allows the Court, upon judicial review, to ensure that Plaintiff's testimony was not arbitrarily discredited.  See id. at *6 (ALJ's reasons must allow court to review decision meaningfully to ensure claimant's testimony not arbitrarily discredited).

medications, and the unexplained absence of treatment for excessive pain.  Id.

As the Ninth Circuit explained in Molina:

> In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation.  For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.]  While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[.]  Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

Molina, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

Plaintiff argues that the reasons given by the ALJ in support of his negative credibility finding are not specific, clear and convincing reasons supported by substantial evidence. Defendant argues that the ALJ's reasons were legally sufficient and should be upheld.[2]

A. Work History

The ALJ found that Plaintiff "was able to work at substantial gainful levels for many years in Customer Service without a problem."  Tr. 23.  The record shows that Plaintiff worked in customer service for Comcast from April 2006 to April or August 2010.  Tr. 39, 228.  She

---

[2] In support of the ALJ's credibility determination, Defendant spends more than two pages discussing Plaintiff's improvement with medications and treatment.  Def.'s Mem. at 7-8. The ALJ noted that Plaintiff had ongoing mental health care with severe symptoms in August 2008 but had showed steady progress with stabilization of her mood and control of her anxiety after her alleged onset date.  Tr. 21.  But, the ALJ did not cite improvement with medications and treatment as a reason for his finding that she was only partially credible.  The court is "constrained to review the reasons the ALJ asserts." Brown-Hunter, 2015 WL 6684997, at *6 (internal quotation marks omitted).  Because the ALJ did not rely on improvement with medications and treatment in support of his credibility determination, I do not consider Defendant's argument on this issue.

began care with Western Psychological & Counseling Services on July 8, 2008, while employed at Comcast. Tr. 334-40. At that time, she presented as suicidal and was having difficulties with depression and anxiety. Tr. 334-40. She was currently going through a divorce. Id. Another stressor was her inability to continue repressing her childhood abuse and her decision to "stand up" to her mother and limit contact with her family. Id. Her symptoms at the time included distractability, impulsivity, boredom, poor memory/confusion, sadness/depression, loss of pleasure/interest, hopelessness, thoughts of death, withdrawal from people, anxiety/worry, and more. Tr. 339. Her emotional and mental struggles were impacting her work capabilities. Id. She was experiencing unspecified work problems. Id.; see also Tr. 338 (noting that Plaintiff's current mental status was severely impacting her performance at work). She was diagnosed with major depressive disorder with depressed moods and anxiety disorder. Tr. 339.

By August 2008, Plaintiff was off of work on either short or long term disability. Tr. 316, 312. She returned to work part-time toward the end of October 2008 and full-time in early November 2008. Tr. 313. She missed approximately three months of work. Tr. 312.

Four months later, Plaintiff began receiving special considerations at work because of her mental health problems. Tr. 214. She was given less time on the phones with the public. Id. Plaintiff testified that she had a hard time complying with the attendance requirements of the job. Tr. 37-38; see also Tr. 209-10 (reporting that she was allowed to work at a lower standard of productivity, worked irregular hours or took frequent rest periods, worked fewer hours, had different, fewer, or easier duties, and was paid for extra rest periods or extra time off and other workers were not)). Nonetheless, she was able to continue working with adjustments until June 2009 when she was in a car accident which she described as "mentally sen[ding] me over the

9 - OPINION & ORDER

edge." Tr. 214, 227.  At that time she went on short-term disability but then she returned to work

on October 26, 2009.  Tr. 214.  She continued working through April 22, 2010 when she again

went on short-term disability because of her mental health issues.  Id.  She stayed on short-term

disability until August 25, 2010 and at that time, was no longer considered employed.  Id.[3]

The ALJ grossly overstated the record by stating that Plaintiff had worked in customer

service for "several years" "without a problem."  While she was employed at Comcast for several

years beginning in April 2006, and while she possibly worked successfully there for the first two

years despite having mental health issues, the record indisputably shows that beginning in July

2008, she experienced mental health problems on such a significant level that she took multiple

leaves of absence, had difficulty meeting attendance standards, and had adjustments made to her

public contact duties.  Thus, once her mental health problems became serious enough for her to

actually seek treatment in July 2008, she did not work "several years without a problem."  The

ALJ's finding is not supported by substantial evidence in the record.

B.  Conflicting Testimony re: Plaintiff's End Date at Comcast

The ALJ discredited Plaintiff's testimony because of what he said was a "conflict in the

record as to when the claimant quit working." Tr. 23.  The ALJ noted that at the hearing and in a

Disability Report, Plaintiff stated that she stopped working on April 22, 2010, but in another

report she stated that she stopped working on August 20, 2010.  Tr. 23 (citing hearing testimony

and Tr. 227-28).

At the hearing, Plaintiff testified that she actually stopped working in April 2010.  Tr. 38-

_____

[3]  The ALJ found the time Plaintiff worked at Comcast from November 2009 until April
2010 an unsuccessful work attempt.  Tr. 18.

10 - OPINION & ORDER

39.  In attempting to clarify the amount of wages earned in that year, the ALJ inquired into when Plaintiff stopped working for Comcast.  Tr. 39.  Plaintiff noted that she had been on short-term disability, then returned for a short period of time.  Id.  Her attorney urged the ALJ to look at the December 27, 2014 Work Activity Report completed at the time of her benefits applications, for clarification.  Id.  There, the Social Security Administration (SSA) interviewer wrote:

> [Plaintiff] started receiving special considerations at work in 03/2009 when she was having increased [mental health] problems.  [Plaintiff] was given less time on the phones with the public.  [Plaintiff] was able to perform [substantial gainful activity], despite adjusted duties, up until 06/03/2009 when the [Plaintiff's] mental health declined to the point where she could no longer work and started receiving Short Term Disability (STD).  [Plaintiff] went back to work on 10/26/2009 thru 04/22/2010 earning approx $2000.00/mo.  This employment ended d/t the [Plaintiff's] worsened [mental health] condition and was less than six months.  [Plaintiff] went back on STD until she was no longer considered "employed" on 08/25/2010.

Tr. 214.

With this information, the ALJ then confirmed that Plaintiff's work at Comcast began in August 2006 and ended in August 2010, but that she "went back to work" from November 2009 through April 2010.  Tr. 39.  Plaintiff agreed "that sound[ed] right."  Id.

The Disability Report cited by the ALJ in his opinion states that Plaintiff stopped working in April 2010 and also states that she stopped working in August 2010.  Tr. 227-28.  The April 2010 date is in a section under "Work Activity" and in response to a question about when Plaintiff stopped working.  Tr. 227.  The August 2010 date appears in a grid asking for a list of jobs performed in the last fifteen years and requesting the dates worked "from" and "to" for each of those jobs.  Tr. 228.  Although the ALJ referred to "a Disability Report" and then "another disability report," Tr. 23, he cited only to the one Disability Report dated December 27, 2010.

See Court Transcript Index to Admin. Record showing Exhibit 4E to be a Disability Report dated December 27, 2010. Although there are other Disability Reports in the record completed after December 27, 2010, none of them contain any information about when Plaintiff stopped working. Tr. 250-51, 252, 259-60, 261-66. There is one "Work History Report," apparently dated December 27, 2010, which contains a grid for the applicant to list the jobs he or she has had in the last fifteen years, with "from" and "to" dates. Tr. 219; Court Transcript Index to Admin. Record showing Exhibit 3E to be a Work History Report dated December 27, 2010. There, consistent with her response to the same "grid-based" question in the December 27, 2010 Disability Report, Plaintiff stated that she worked at Comcast until August 2010. Tr. 219.

Apparently, the ALJ found that Plaintiff's testimony was not entirely credible because of the "conflict in the record" regarding when she stopped working. While there might be some slight initial confusion upon seeing two different dates in 2010, it is not a reasonable interpretation of the record to call this a "conflict." In response to questions asking for the "to" and "from" dates that the applicant worked for a particular employer, Plaintiff indicated she stopped working in August 2010. When asked to explain in narrative form when she actually stopped working, Plaintiff indicated April 2010. There is no inconsistency and even if there were, it is explained by the narrative entered by the SSA interviewer stating that Plaintiff actually stopped working in April 2010 but she was on short-term disability until August 2010 when her employment ended. Tr. 214. The only reasonable interpretation of the evidence is that Plaintiff was considered an employee until August 2010 but actually stopped working in April 2010.[4] There is no "conflict" in the record and using the confusion about her end date as a basis for

---

[4] The ALJ himself found that Plaintiff's work at Comcast ended in April 2010. Tr. 18.

finding her not credible is not a supportable clear and convincing reason.

C.  Post-Alleged Onset Date Job Applications & Seasonal Employment with Converse

The ALJ found Plaintiff only partially credible because she had been "actively applying for customer service jobs despite her 'disability[.]'" Tr. 23.  At the hearing, Plaintiff testified that since April 2010, when she stopped working for Comcast, she applied for "other" customer service jobs but had always "teared up and shown real anxiety during interviews." Tr. 49.  She applied for customer service positions because that is what she has experience with.  Id.  Her testimony appears to be the only evidence in the record on this issue.

While some cases have recognized that applying for jobs after an alleged onset date may be relevant to the "evaluation of plaintiff's credibility[,]" Smith v. Commissioner, No. 06:14-cv-01606-MA, 2015 WL 7720502, at *6 (D. Or. Nov. 30, 2015) (concluding, however, that when all relevant evidence regarding plaintiff's work activity was considered, the ALJ failed to provide clear and convincing reasons to reject the plaintiff's subjective testimony) (citing Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996)), the evidence in this record is not substantial enough to be clear and convincing.  The record fails to show how many jobs Plaintiff applied for during this time or any motive for these applications.  Plaintiff may have tried to work in spite of her symptoms, not because they were less severe than alleged.  This is especially true when Plaintiff's mental impairments, as the ALJ expressly recognized, are "severe" and produce symptoms that "fluctuate with life's stressors[.]" Tr. 21.  Moreover, the only evidence in the record is that Plaintiff was unable to complete the application process because of her performance during interviews.  She was not hired for any of these positions.  As Judge Acosta recently recognized, the ALJ's reliance on an attempt to find full-time work "cannot provide clear and convincing

evidence for rejecting" the plaintiff's symptom testimony when the plaintiff was not hired for the position and thus there was no evidence she could have actually managed a full-time workload. <u>Williams v. Colvin</u>, No. 01:13-cv-1720-AC, 2015 WL 1246189, at *12 (D. Or. Mar. 17, 2015).

Plaintiff also testified that she worked in November of 2012 at Converse, stocking shelves and assisting customers. Tr. 36. It was part-time seasonal work, lasting for only eleven days. Tr. 37-38. Plaintiff explained that it did not go well. She had constant panic attacks, was constantly "on alert of my surroundings" and had a hard time dealing with customers. Tr. 37. As with the job applications referred to in the prior paragraph, her testimony appears to be the only evidence in the record on this issue. It shows that while Plaintiff was able to get hired, the job did not last and she had difficulty performing it. Finding her symptom testimony not credible based on an eleven-day job that Plaintiff could not adequately perform is not a clear and convincing reason to reject such testimony.

D.  Activities of Daily Living

The ALJ also based his credibility finding on Plaintiff's "wide" activities of daily living. Tr. 23. He noted that she was "independent with her personal care and grooming, can do light housework such as laundry, drives a car, shops for food and clothes in stores, and enjoys reading, knitting, and watching television." <u>Id.</u> He also relied on her taking community college classes full-time, where he noted that she earned average grades "with some accommodation." <u>Id.</u> He reasoned that her "school attendance suggests that she has career goals and ambitions, and her ability to maintain a full course load, and other activities of daily living, supports the conclusion that the claimant is capable of returning to work at the residual functional capacity outlined above." <u>Id.</u>

14 - OPINION & ORDER

The ALJ cited pages 1-5 of Plaintiff's January 11, 2011 Functional Report as support for her non-school activities of daily living. Tr. 23 (citing Tr. 234-38). There, Plaintiff notes that her impairments have produced a lack of motivation, crying spells, suicidal thoughts, and flashbacks which limit her ability to work. Tr. 234. She describes her day as consisting of lying in bed, reading, sometimes crying, napping, and eating. Tr. 235. In response to specific questions on the form, she stated that she is uninterested in bathing the majority of the time, is uninterested in caring for her hair, but that she can feed herself. Tr. 236. Her "friend" reminds her to take care of her personal needs and grooming "when it has been awhile" and reminds her to take medications. Id. She prepares food only two times per month and has a lack of interest in cooking or eating. Id. She does laundry but needs encouragement and reminders to do so. Tr. 237. She can drive a car but states that she does not drive because of crying spells. Id. However, if she cannot get a ride and she has an appointment, she drives herself. Id. She shops in stores and by computer, for "easy food" if needed, and clothes, but only for 20-30 minutes. Id. Her social activities are limited to interacting with the friend she lives with. Tr. 238. She very rarely goes other places to socialize. Id.

The ALJ's characterization of Plaintiff's activities is inaccurate. While Plaintiff engages in the activities noted, the manner in which she performs them is not at the level suggested by the ALJ. The ALJ failed to note that she bathes infrequently and only with reminders, that she prepares food only a couple of times per month, that she does not actually drive a car unless she cannot find a ride, and that her shopping expeditions are limited in duration. The record cited by the ALJ does not provide substantial evidence in support of his findings based on Plaintiff's non-school daily activities.

15 - OPINION & ORDER

As to her community college attendance, Plaintiff explained that her educational goal was to find graphic/web design work where she could freelance from home in order to avoid "nonstop triggers and constant stress." Tr. 44, 48. Such work would allow Plaintiff to work independently of others and it would involve no direct interaction with people. Tr. 48. Even still, Plaintiff believed that her symptoms would still preclude full-time work. Tr. 48-49. Plaintiff's "career goals and ambitions" do not support the ALJ's negative credibility finding. In fact, her desire to perform some type of work given her impairments is a positive attribute. Her description of what she hoped to attain with her education is not inconsistent with her subjective testimony.

However, her ability to maintain a full course load could undermine her allegations of disabling-level symptoms. But, here, the community college records cited by the ALJ do not support his finding that she was a full-time student every quarter. Tr. 286-88 (showing only one class taken in Fall 2011; showing three classes taken in Winter 2012 and Spring 2012 which presumably is full-time, but also showing she earned a "D" in one class in Winter 2012; showing enrollment in three classes for Fall 2012 but no indication if they were completed). And, more importantly, as the ALJ acknowledged, Plaintiff had accommodations at the community college. Tr. 23 ("with some accommodation"). Plaintiff received services from the college's Disability Services department. Tr. 285. Specifically, she was given extra time and a reduced distraction room for testing. Id. She also received flexibility in attendance, deadlines, and in the ability to leave class. Id.; see also Tr. 41 (Plaintiff testimony that pursuant to her accommodations, she leaves class at least once or twice per week and goes to her car to "take some breathing time" and if she misses part of an exercise, she has to get special tutoring or sometimes "take[s] the fall on it and it will show in my grades"); Tr. 537 (Letter from Polk County Mental Health requesting

educational accommodations due to Plaintiff's mental health impairments). Thus, while a claimant's full-time attendance in school <u>could</u> undermine the claimant's allegations of disabling symptoms, the record here shows that Plaintiff was able to attend school because of accommodations. The ALJ's negative credibility finding based on the claimant's school activities was not reasonable.

    E. Secondary Gain

       Finally, the ALJ found Plaintiff not fully credible because she may have been motivated to file her disability claims by non-impairment financial reasons. Tr. 23. This Court has previously rejected this as a basis for finding a claimant not credible:

> By definition, every claimant who applies for Title II benefits does so with the knowledge—and intent—of pecuniary gain. That is the very purpose of applying for Title II benefits. The same motivation afflicts every applicant for workers compensation benefits, and every personal injury plaintiff. If the desire or expectation of obtaining benefits were by itself sufficient to discredit a claimant's testimony, then no claimant (or their spouse, or friends, or family) would ever be found credible.

<u>Ratto v. Sec'y</u>, 839 F. Supp. 1415, 1428-29 (D. Or. 1993); <u>see</u> <u>also</u> <u>Bush v. Astrue</u>, No. CV10-780-SU, 2011 WL 3420617, at *12 (D. Or. July 8, 2011) ("A claimant's motive of pecuniary gain is an improper basis on which to determine that subjective complaints are not credible"), adopted by J. Redden, 2011 WL 3420666 (D. Or. Aug. 4, 2011);

       In summary, the reasons provided by the ALJ in support of his negative credibility finding are not supported by substantial evidence in the record. The Ninth Circuit reiterated in a 2014 case that the "clear and convincing standard" is "not an easy requirement to meet" and is "'the most demanding required in Social Security cases[.]'" <u>Garrison v. Colvin</u>, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting <u>Moore v. Comm'r</u>, 278 F.3d 920, 924 (9th Cir. 2002)). The ALJ

failed to meet that standard in this case and thus erred by finding Plaintiff's subjective limitations testimony only partially credible.

II.  Nurse Practitioner Lori Linton-Nelson's Functional Assessment

Plaintiff received counseling and medication services from Polk County Mental Health from October 2010 until at least March 2013.  Tr. 342-56, 416-70, 578-98.  She participated in regular individual counseling sessions as well as a counseling group focused on "Seeking Safety."  Id.  Lori Linton-Nelson is a Psychiatric Mental Health Nurse Practitioner who was Plaintiff's treating provider at Polk County Mental Health.  In addition to Plaintiff's frequent appointments with her therapist and attendance at the group, Plaintiff saw Linton-Nelson more than two dozen times, beginning in November 2010 and continuing at least until January 2013.  Tr. 343, 346, 442, 342, 452, 461, 475, 491, 500, 522, 531-32, 535, 542-43, 549-50, 568-70, 582-86, 590-94.

On April 10, 2014, Linton-Nelson completed a Medical Source Statement, assessing what Plaintiff can do despite her impairments.  Tr. 601-05.  The form instructed Linton-Nelson to mark the activities Plaintiff could perform on a regular and continuing basis, reflecting the claimant's ongoing capacities, not those related to an isolated acute episode.  Tr. 601.  In response to questions, Linton-Nelson stated that Plaintiff would need to rest about two hours in an eight-hour day because she is easily fatigued due to her depressed mood and anxiety, which was variable depending on the cycle of her bipolar disorder and on whether insomnia had been problematic.  Id.  Linton-Nelson also stated that Plaintiff would need frequent breaks of 15-20 minutes every hour when depressed.  Id.  She further stated that Plaintiff would miss four or more days of work because of her conditions and treatment.  Tr. 604.  Although she indicated

18 - OPINION & ORDER

this would be temporary because of Plaintiff's "cycling," she noted that it would recur.  Id.

Linton-Nelson indicated that side effects of Plaintiff's medications included sedation, somnolence, low energy, nausea, confusion, and decreased alertness.  Tr. 603.  She wrote that when Plaintiff was cycling with mania, she often had "preoccupation in mind w/inability to focus on getting to work or doing her job."  Id.  She also wrote that when Plaintiff is in mania, she is unable to concentrate or maintain attention, but when she is depressed, she cannot get up out of bed to a job or stay motivated or be productive, even with her activities of daily living.  Tr. 604.

In regard to particular skills, she rated Plaintiff as "poor[5]," in the following functional abilities:  (1) the ability to travel alone in unfamiliar places; (2) the ability to understand, remember and carry out simple 1 or 2 step instructions; (3) the ability to understand, remember and carry out detailed but uninvolved written and oral instructions; (4) the ability to maintain attention for extended periods or 2 hour segments; (5) the ability to maintain regular attendance and be punctual with customary tolerances; (6) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (7) the ability to ask simple questions or request assistance; (8) the ability to accept instructions and respond appropriately to criticism from supervisors; (9) the ability to make simple work-related decisions; and (10) the ability to respond appropriately to changes in a routine work setting.  Tr. 602-03.  Overall, she assessed Plaintiff as moderately impaired in activities of daily living and markedly

---

[5]  The form defined "poor" as a "substantial loss of ability to perform the named activity independently, appropriately, effectively and on a sustained basis in regular, competitive employment; and, at best could do so only in a sheltered work setting or where special accommodations are provided."  Tr. 602.

impaired in the abilities to maintain social functioning and to maintain concentration,

persistence, or pace.  Tr. 603.  She also assessed Plaintiff as having three or more episodes of

decompensation within a 12-month period, each of which would be at least two weeks duration.

Id.

      The ALJ gave Linton-Nelson's opinion "little weight," citing four reasons for rejecting her

assessment:  (1) as a nurse practitioner, she is not an "acceptable medical source"; (2) the

limitations are not supported by the objective medical evidence or the claimant's activities of

daily living which include attending school and efforts to apply for work; (3) the opinion is based

solely on Plaintiff's subjective representations; and (4) Linton-Nelson "is acting as an advocate

for the claimant."  Tr. 22.  Plaintiff argues that the ALJ erred in failing to credit Linton-Nelson's

assessment

      The ALJ is correct that a nurse practitioner is not an "acceptable medical source" under

20 C.F.R. §§ 404.1513, 416.913.  Under the regulations, acceptable medical sources are used to

establish the existence of an impairment.  Id.  They may also provide statements about what a

claimant can do despite the claimant's impairments.  Id.  A nurse practitioner is recognized as an

"other source" who is relied on to "show the severity of your impairment(s) and how it affects

your ability to work."  Id.; see also Garrison, 759 F.3d at 1013-14 (ALJ failed to recognize that

the nurse practitioner "qualified as an 'other source' that can provide evidence about  the severity

of a claimant's impairment(s) and how it affects the claimant's ability to work") (quoting 20

C.F.R. § 404.1513(d)) (brackets omitted).

      Social Security Ruling (SSR) 06-03p, available at 2006 WL 2329939, expressly

recognizes that while nurse practitioners and other "medical other sources" cannot establish the

20 - OPINION & ORDER

existence of a medically determinable impairment, they nonetheless may have information which is "based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." 2006 WL 2329939, at *1. SSR 06-03p goes on to recognize that

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners . . . have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Id. at *3.

The SSR notes that the regulations in 20 C.F.R. 404.1527(d) and 416.927(d) apply only to the evaluation of medical opinions from acceptable medical sources. Id. at *4. But, the SSR instructs, "these same factors can be applied to opinion evidence from 'other sources.'" Id. The SSR explains that "[t]hese factors represent basic principles that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources' as well as from 'other sources,' such as teachers and school counselors, who have seen the individual in their professional capacity." Id. Thus, in recognition of the increased reliance on "medical other sources," and other professionals who by virtue of their training and treatment relationships have particular expertise, the SSR directs that a discussion of the relative weight to give to a nurse practitioner opinion should include the following factors: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4)

21 - OPINION & ORDER

how well the source explains the opinion; (5) whether the source has a specialty or area of

expertise related to the individual's impairment(s); and (6) any other factors that tend to support

or refute the opinion. Id. at **4-5.

Defendant states that as an "other source," the opinion of a nurse practitioner is properly

discounted by providing "germane reasons." See Molina, 674 F.3d at 1111 (because physician's

assistant was not an acceptable medical source, ALJ could discount physician's assistant's

opinion for germane reasons); Dale v. Colvin, No. 03:13-cv-01187-HZ, 2014 WL 1917980, at *7

(D. Or. May 13, 2014) (because nurse practitioner was an "other source," ALJ could reject

opinion for germane reasons).  Defendant argues that one "germane reason" for the ALJ's

rejection of Linton-Nelson's assessment is that only acceptable medical sources are entitled to

make diagnoses and give medical opinions that could be given controlling weight.  20 C.F.R. §§

404.1527, 416.927; SSR 06-03p, 2006 WL 2329949, at *2.  Other than making that assertion,

however, Defendant does not argue that the ALJ's rejection of Linton-Nelson's opinion because

she was not an "acceptable medical sources" was appropriate.  Instead, Defendant simply states

that the "ALJ provided additional reasons."  Def.'s Mem. at 14.

Defendant likely recognizes that the ALJ had already found that Plaintiff's severe

impairments included bipolar disorder, major depressive disorder, post-traumatic stress disorder,

and anxiety disorder.  Tr. 18.  Linton-Nelson's opinion was not being offered to establish the

existence of a diagnosis or impairment.  As the regulations and SSR 06-03p suggest, in rejecting

the functional assessment of a medical other source, a "germane reason" is not the single

statement that the practitioner is not an acceptable medical source.  Given Linton-Nelson's status

as Plaintiff's treating nurse practitioner for more than two and one-half years and given that she

has a specialty in mental health and psychiatric disorders, the ALJ should have assessed the weight of her opinion by examining the factors set forth in SSR 06-03p.

As to the remaining reasons offered by the ALJ, the ALJ indicated that Linton-Nelson's opinion was not supported by the objective medical evidence. Here, the ALJ's failure to be more specific prevents the Court from assessing the validity of his opinion. As noted, the ALJ expressly found that Plaintiff suffered from a variety of severe mental health impairments. He also remarked on her fluctuating symptoms which Linton-Nelson noted in her functional assessment. Given the ALJ's recognition of Plaintiff's impairments and the nature of those impairments, it is unclear exactly what objective medical evidence the ALJ found undermines Linton-Nelson's assessment. The ALJ should have been more specific.

In supporting the ALJ's opinion, Defendant cites to a single counseling note made by therapist Ingrid Siadal on June 25, 2012 indicating that Plaintiff passed her final, managed the stress of school, passed her classes, and was accepted to a particular visual communications class at the community college. Def.'s Mem. at 15 (citing Tr. 540). This single chart note, however, was expressly focused on Plaintiff's goal of binge eating and does not address other impairments. Also, a single chart note does not address the cyclical nature of her symptoms as noted by Linton-Nelson. Finally, the positive accomplishments noted in the chart note all relate to school where Plaintiff had accommodations and thus do not, on their face, provide "objective medical evidence" undermining Linton-Nelson's opinion.[6]

Next, in arguing that the ALJ did not err, Defendant cites to non-examining state agency

---

[6] It is notable that Defendant here relies on what is essentially Plaintiff's self-report as "objective medical evidence" when the ALJ rejected Linton-Nelson's assessment in part because it relied on Plaintiff's self-reports.

consultants who found Plaintiff did well on medications in 2010 and 2011, and had organized

thoughts with baseline cognition and good attention and concentration. Def's Mem. at 15 (citing

Tr. 61, 70, 82, 91).    The pages of these reports relied on by Defendant cite to the underlying

mental health records.    In the first two reports, which are identical, the consultative examiner

cited records from 2009 and 2010 indicating that in April 2009, Plaintiff reported a stable mood

and anxiety under control, but in October 2010, she reported a depressed mood and had a flat

affect. Tr. 61, 70. A few weeks later, attention and concentration were rated as fair. Id. Another

month later, on December 3, 2010, they were rated as good. Id. She was also still experiencing

pain and anxiety attacks when in public, although was feeling less depressed and less anxious

overall on medication. Id. In the second two reports, which are also identical, the consultative

examiner noted the same December 3, 2010 report that Plaintiff's attention and concentration

were good, her cognition was at baseline, and she was less depressed on her medications. Tr. 82,

91. These reports also noted that on February 14, 2011, she reported feeling less emotionally

labile, but still suffering from anxiety, mostly in crowds or social settings, and occasional

agitation and irritability. Id. Her attention and concentration were still good and her cognition

was at baseline. Id.

      The problem with citing a few selective records, however, is the failure to capture the ups

and downs of Plaintiff's impairments, especially her bipolar disorder. My review of all of

Linton-Nelson's chart records shows that Plaintiff had significant problems at some points,

improvement on medication at others, then a recurrence of symptoms, another tweak of

medications, often followed by stability for a period of time before symptoms occurred again.

Compare Tr. 344 (Nov. 1, 2010 report noting that Plaintiff was alert, oriented, pleasant, and

easily engaged, but feeling sad, hopeless, helpless, worthless, and suicidal; reporting crying most days, a desire to sleep 24 hours a day but having other days when she cannot sleep at all; reporting increased depressed mood, increasingly intense anxiety, agitation, and difficulty maintaining attention); Tr. 442 (Jan. 10, 2011 report noting feeling labile with a cycle of feeling tearful, then happy, then suicidal, then happy); 475 (Sept. 29, 2011 report noting increased depression, low motivation, flat affect); Tr. 491 (Oct. 12, 2011 report noting increased depression and need to increase Lamictal and Celexa as a result); Tr. 522 (Feb. 8, 2012 report noting anxiety and panic attacks related to medical diagnosis); Tr. 531-32 (April 6, 2012 report noting increased mood lability, increased depression, increased somnolence, and ongoing nightmares); Tr. 549-50 (Sept. 26, 2012 report noting increased depression, possibly due to a medication change); Tr. 568-70 (Nov. 21, 2012 report noting increased depression, feeling suicidal, struggles with motivation, lethargy, feelings of helplessness and hopelessness, difficulty with schoolwork, flat affect, dysphoric mood); Tr. 582-85 (Dec. 10, 2012 report noting mood not improved, still feeling lethargic, unmotivated, difficulty concentrating, mildly disorganized thoughts, mildly disheveled, inability to concentrate); with Tr. 346 (Dec. 3, 2010 report noting feeling better, less depressed, less anxious after a month on medication); Tr. 452 (Mar. 28, 2011 report noting return of nightmares on Celexa but better mood and less emotionally labile with occasional agitation and irritability and anxiety in crowds and social settings); Tr. 500 (Nov. 9, 2011 report noting better mood without depression but experiencing five days of hypomania); Tr. 535, 542-43 (May 7, 2012 and Aug. 17, 2012 reports noting decrease in lability and anxiety with stability and denial of depression and anxiety).

       As Linton-Nelson's records show, Plaintiff enjoys periods of stability, but she does not

maintain them for more than a few months at a time.  The Medical Source Statement asked

Linton-Nelson to assess Plaintiff's activities as she could perform them on a regular and

continuing basis.  Given the cyclical nature of her impairments, the records cited by Defendant

(and not cited by the ALJ) support rather then detract from the reliability of Linton-Nelson's

assessment.

Next, Defendant argues that the ALJ's rejection of Linton-Nelson's assessment is justified

because the ALJ properly found that the report was based on Plaintiff's subjective reports.

Defendant cites to Bray v. Commissioner, 554 F.3d 1219, 1228 (9th Cir. 2009), for the

proposition that even a treating practitioner's work restrictions that are based on a person's

subjective characterization of symptoms are reasonably discounted when the ALJ has found the

claimant to be less than credible.  Here, however, the ALJ improperly rejected Plaintiff's

subjective symptom testimony and thus, it is error to reject Linton-Nelson's assessment because it

was based on Plaintiff's own reports.

Finally, the ALJ stated that Linton-Nelson was "acting as an advocate for the claimant."

Tr. 22.  The ALJ gave no reason and cited no evidence in support of this statement.  The law

makes clear that a medical opinion may not be rejected because it was solicited by Plaintiff or her

counsel.  E.g., Reddick v. Chater, 157 F.3d 715, 726 (9th Cir. 1998) (further remarking that "in

the absence of other evidence to undermine the credibility of a medical report, the purpose for

which the report was obtained does not provide a legitimate basis for rejecting it").  In the

absence of findings showing impropriety or lack of objectivity by Linton-Nelson, the ALJ's

statement that Linton-Nelson was improperly acting as advocate is unsupported by the record and

is not a clear and convincing reason for rejecting her assessment.

26 - OPINION & ORDER

None of the reasons given by the ALJ for rejecting Linton-Nelson's medical source functional assessment are supported by the record. The ALJ did not provide clear and convincing reasons and thus, his failure to credit her assessment was error.

III. Lay Witness Testimony

Plaintiff's boyfriend Christopher Roller provided a written Third Party Function Report dated January 11, 2011. Tr. 242-49. Plaintiff and Roller live together and thus, he has firsthand knowledge of Plaintiff's daily activities. In response to a question asking how Plaintiff's illnesses, injuries, or conditions prevent her from working, Roller noted Plaintiff's constant crying spells, fatigue, frequent nervous breakdowns, and anxiety attacks. Tr. 242. He noted that most of Plaintiff's day is spent reading or napping and that she attends therapy weekly. Tr. 243. Her children live with their father who takes care of them. Id. Roller remarked that Plaintiff's sleep is troubled, she is unable to sleep without interruption, and she is constantly tired. Id. In regard to her personal care, she needs to be reminded to bathe and groom. Tr. 243-44. She sometimes needs reminders to take her medications. Id. She lacks motivation or is too tired to cook. Tr. 244. She does laundry and light cleaning but needs to be reminded to do so. Id. Although Plaintiff can drive, Roller drives her wherever she needs to go. Tr. 245. Roller noted Plaintiff's dislike for driving because of her fear of anxiety attacks. Id. She shops in stores or via computer although she does not like to spend time in stores if they are crowded. Id.

Roller described Plaintiff's hobbies and interests as reading, knitting, watching television, and photography. Tr. 246. As a result of her conditions, her interest in reading has increased but her interest in other activities has decreased. Id. The two of them watch movies and television together. Id. Plaintiff goes to therapy weekly but has lost interest in socializing with friends. Id.

She has become very introverted.  Id.  Her conditions affect her abilities to concentrate and get

along with others.   Tr. 247.  She is easily distracted, experiences mood swings, and is

disinterested in socializing.  Id.  Her conditions have caused problems in relationships.  Id.  She

can pay attention for about an hour.  Id.  She does not get along well with authority figures.  Id.

She is unable to handle stress and does not do well with changes in routine.  Tr. 248.  Her

medications cause fatigue.  Id.

> The ALJ gave Roller's report "full consideration[.]" Tr. 22.  The ALJ found that Roller's
>
> statement regarding the claimant's abilities generally supports the conclusion that
> the claimant is limited to the residual functional capacity outlined above.  To the
> extent that Mr. Roller suggests that the claimant's impairments render her unable
> to work, the undersigned finds that Mr. Roller's close relationship with claimant,
> and a desire to help her, likely influenced his opinion regarding the claimant's
> activities.

Tr. 22-23.

Plaintiff argues that the RFC did not include all of the limitations observed by Roller and

the ALJ improperly rejected Roller's opinion about such limitations.  Defendant argues that

because a "close relationship" is relevant to the weight an ALJ gives a witness's statement, the

ALJ gave at least one germane reason to reject Roller's testimony.  Additionally, Defendant

contends that to the extent the ALJ erred, any such error was harmless because the ALJ

accounted for Roller's limitations in the RFC.  According to Defendant, Roller's testimony

supports limitations only in concentration and in Plaintiff's ability to get along with others.

Because the ALJ limited Plaintiff to simple, routine, and repetitive work tasks involving simple

work instructions performed in a low-stress work environment, only occasional contact with

supervisors and coworkers, and minimal to no contact with the public, the ALJ accounted for

Roller's testimony.

I disagree with Defendant.  "Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account."  Molina, 674 F.3d at 1114.  The ALJ must give reasons "germane to the witness" when discounting the testimony of lay witnesses.  Valentine, 574 F.3d at 694.   In the case cited by Defendant, the ALJ discounted a lay witness's testimony because the witness's statements were inconsistent with the claimant's presentation to treating physicians, were inconsistent with the claimant's failure to participate in cardiac rehabilitation, and because the witness, who had a "close relationship" with the claimant, was possibly influenced by her desire to help the claimant. Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006).  The Ninth Circuit, without discussing the reasons individually, concluded that the ALJ's reasons for doubting the credibility of the lay witness were "germane" to her and thus, it was not error for the ALJ to disregard her testimony. Id.

In contrast, in the instant case the only reason given by the ALJ to support his rejection of some of Roller's testimony was Roller's close relationship with Plaintiff.  If this were a legitimate reason to discredit a lay witness's testimony, every spouse, close relative, or friend who testifies in support of a claimant would be rejected as a non-credible witness.  The Valentine court explained that "regardless of whether they are interested parties, friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to his or her condition."  574 F.3d at 694 (internal quotation marks and brackets omitted).  A "germane" reason still needs to be supported by substantial evidence in the record.  Without any facts suggesting that the status of his relationship to Plaintiff impaired his ability to testify objectively,

29 - OPINION & ORDER

the ALJ erred in rejecting Roller's testimony simply because he has a close relationship with her. Nacoste-Harris v. Colvin, No. 3:14-cv-01594-JO, 2015 WL 7012750, at *7 (D. Or. Nov. 12, 2015) (ALJ erred in rejecting lay witness testimony based on the witnesses' "affection" for the claimant; noting that "[s]uch reasoning would exclude statements from all the friends and family of a claimant" and that their "statements cannot be discounted solely because of their relationship to the claimant.").

I also reject Defendant's argument that the RFC accounted for Roller's testimony and thus any error was harmless. The ALJ's RFC did not account for Roller's observations of Plaintiff's need to be reminded to complete basic tasks. It did not account for work interruptions based on constant crying spells, frequent nervous breakdowns, and anxiety attacks. The ALJ's error in rejecting Roller's lay witness testimony was not harmless.

IV.  Other Arguments

Although Plaintiff raises other arguments, including that the ALJ erred by failing to address the disability accommodations given by Chemeketa Community College, I do not address them because it is clear that the ALJ's errors in rejecting Plaintiff's testimony, Linton-Nelson's assessment, and Roller's testimony require that the Commissioner's decision be reversed. Further, as discussed below, because of those errors the case should be remanded for an award of benefits.

V.  Remand for Benefits

Plaintiff argues that when the evidence in the record is properly considered, she has established disability at either Step 3 or Step 5. As a result, she contends that the case should be remanded for benefits.  In social security cases, remands may be for additional proceedings or

30 - OPINION & ORDER

for an award of benefits.  E.g., Garrison, 759 F.3d at 1019 (explaining that if "additional

proceedings can remedy defects in the original administrative proceeding, a social security case

should be remanded [,]" but "in appropriate circumstances courts are free to reverse and remand a

determination by the Commissioner with instructions to calculate and award benefits") (internal

quotation marks omitted).

       To determine which type of remand is appropriate, the Ninth Circuit uses a three-part test.

Id. at 1020; see also Treicher v. Comm'r, 775 F.3d 1090, 1100 (2014) ("credit-as-true" rule has

three steps).  First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence,

whether claimant testimony or medical opinion.  Garrison, 759 F.3d at 1020.  Second, the record

must be fully developed and further administrative proceedings would serve no useful purpose.

Id.  Third, if the case is remanded and the improperly discredited evidence is credited as true, the

ALJ would be required to find the claimant disabled.  Id.  To remand for an award of benefits,

each part must be satisfied.  Id.; see also Treicher, 775 F.3d at 1101 (when all three elements are

met, "a case raises the 'rare circumstances' that allow us to exercise our discretion to depart from

the ordinary remand rule" of remanding to the agency).

       Each part of the three-part test is met in this case.  The ALJ failed to provide legally

sufficient reasons for rejecting evidence.  The record is fully developed and further

administrative proceedings would serve no useful purpose.  Even if the record did not support a

Step 3 finding of a listed impairment, the record establishes that when Plaintiff's, Linton-

Nelson's, and Roller's testimony is credited, there are no jobs in the economy that Plaintiff can

perform.  Tr. 55 (vocational expert testimony that an individual who could not perform tasks on a

regular and continuous basis for a full eight hour day, five days a week, for a forty-hour

workweek or equivalent work schedule, would be precluded from all sustained gainful

employment).  When the improperly discredited evidence is credited, the ALJ would be required

to find Plaintiff disabled at Step 5.

CONCLUSION

The Commissioner's decision is reversed and remanded for a determination of benefits.

IT IS SO ORDERED.

Dated this ___18___ day of _____December_____, 2015



_Marco Hernandez_

Marco A. Hernandez
United States District Judge

32 - OPINION & ORDER